UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTELLE BELKO,<br><br>                Plaintiff,<br><br>   v.<br><br>THE UNIVERSITY OF PITTSBURGH,<br><br>                Defendant. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Estelle Belko, by her attorneys, Stember Cohn & Davidson-Welling, LLC, brings this Complaint against Defendant The University of Pittsburgh, and alleges in support:

## INTRODUCTION

1. Plaintiff Estelle Belko ("Belko" or Plaintiff) brings this action against Defendant, the University of Pittsburgh (the "University" or "Defendant) because it: (i) fired due to her disability; (ii) and (ii) retaliated against her when she sought continuation of a long-standing reasonable accommodation. These claims are brought under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.* ("PHRA").

## PARTIES

2. Belko is a resident of Allegheny County, Pennsylvania.

3. Defendant the University of Pittsburgh ("Defendant" or "Pitt"), is a state-related university organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 4200 Fifth Avenue, Pittsburgh, PA 15260. At all relevant times, Defendant

employed more than 15 full-time employees and was Belko's "Employer" under the ADA and the PHRA.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over her related state law claims under 28 U.S.C. § 1367.

5. Venue in this Court is proper under 28 U.S.C. § 1391, as the facts and events that give rise to these causes of action occurred in, and Defendant is located in, the Western District of Pennsylvania.

## FACTS

6. Belko is an individual with a disability, insofar as Belko has a seizure disorder known as epilepsy, which substantially limits her with regard to several major life functions, including her ability to think or concentrate, her ability to control her physical movements, and her ability to work.

7. In or around August 2015, Belko was offered a position with the University to become the Assistant Director of Financial Aid Special Programs, which she accepted.

8. Prior to accepting the position, Belko disclosed her seizure disorder to then-Director of Budget and Human Resources, Peggie Dunklin.

9. Following her hire, Belko also disclosed her condition to then-Director of Financial Aid, Randy McCready.

10. For the first several months of her employment, Belko suffered from no seizures while at work.

11. On or about November 19, 2015, Belko experienced her first workplace seizure. She did not experience another until February 26, 2016.

12. In response to her second seizure, Belko's managers (including Janet McLaughlin, Peggie Dunklin and Randy McCready) voiced concerns about how they should respond to a seizure event.

13. In response, Belko arranged for a meeting with a representative of the Epilepsy Foundation.

14. At the meeting, on or about March 8, 2016, an Epilepsy Foundation representative explained that Belko's epilepsy was a long-standing concern, and discussed how her management team could be most helpful in the event of a seizure.

15. Approximately one week later, on March 16, 2016, Belko experienced another seizure at work.

16. Belko was taken the hospital, where she was admitted overnight for observation, and released the following day.

17. When Belko returned to work, on March 21, 2016, she was instructed to meet with Dunklin, McCready and McLaughlin (who attended via telephone).

18. During that meeting, Dunklin explained that University Employee Relations representative (Janet Volk) had directed Belko to meet with the University's "Disability Services," because Dunklin, McLaughlin and McCready "had gone too far" in trying to accommodate Belko during her last seizure.

19. During the same meeting, McCready noted that Belko had experienced more seizures than they anticipated. McCready then said that there were no "current plans to replace" Belko, but that "if the seizures continue it could affect your position."

20. McCready also told Belko that while she was doing good work, her seizers were a "distraction" to her co-workers.

3

21. During the same meeting, Dunklin announced a new "rule," namely, that for every seizure she experienced at work, Belko would not be permitted to return to work until she received written clearance from her physician.

22. On March 23, 2016, Belko met with Leigh Culley, who worked for the University's Disability Services.

23. Culley explained to Belko that it was the University's "goal" to place Belko on a leave of absence as an accommodation until Belko's medications got her seizure disorder under control.

24. Belko explained that she was not wanting to take a leave of absence at that time, and provided her discharge papers authorizing her return to work.

25. Culley looked at the papers, and returned them to Belko without copying them.

26. On March 31, 2016, Belko's physician sent a letter advising the University of Belko's return to work.

27. Nevertheless, Belko's managers continued to encourage her to take a medical leave of absence.

28. After continuous pressure from her supervisors, Belko decided to take medical leave, during which she explored additional treatment options for her epilepsy.

29. Upon her return, Belko's managers continued to make disparaging comments regarding her epilepsy, causing great stress to Belko.

30. Following an episode of severe depression, Belko was later hospitalized, which necessitated another medical leave of absence.

31. On October 1, 2016, Belko's treating psychologist cleared her to return to work "without any restrictions."

32. On or about October 9, 2016, Belko returned from her second medical leave of absence.

33. Upon return, Dunklin and McCready advised Belko that she may be placed on a "Performance Improvement Plan." The basis for the potential Performance Improvement Plan was based on her medical leaves, not Belko's performance. Specifically, because many of Belko's job responsibilities had been performed by other employees during Belko's absence, Dunklin and McCready claimed that Belko was not meeting the University's expectations of a supervisor.

34. On November 10 and 16, Belko experienced two more seizures.

35. On November 16, 2016, Belko was again placed on a medical leave of absence, during which she received short-term disability benefits, for approximately six weeks.

36. Belko sought to return to work in December 2016.

37. However, the University did not permit her to return to work.

38. Instead, on December 16, 2016, the University attempted to send a letter to Belko's treating psychologist, Dr. Kreinbrook, encouraging him to deny that Belko could safely return to work.

39. Specifically, the University's letter asked Dr. Kleinbrook to reconsider his decision in October to clear Belko to return to work, due to her ongoing seizure disorder.

40. Dr. Kleinbrook was not Belko's physician, and was not involved in the assessment or treatment of Belko's seizure disorder.

41. In any event, the University never actually sent the letter to Belko's treating psychologist. Instead, the University sent the letter to MetLife, Belko's short- and long-term disability insurance carrier, and asked it to "forward" the letter to Belko's psychologist.

42. MetLife had no obligation to send such correspondence on the University's behalf, and Dr. Kreinbrook did not receive the letter.

43. On December 19, 2016, the University's Benefits Specialist contacted Belko to "go over your options moving forward concerning Long Term Disability (LTD)."

44. Belko had not inquired about seeking long-term disability benefits, because she was seeking to return to work.

45. Shortly thereafter, Belko spoke with the University's Benefits Specialist to discuss returning to work and any potential long-term disability claim. She advised Belko that, if long-term disability benefits were approved, the University would terminate Belko.

46. On or about December 27, 2016, Belko ran into Peggie Dunklin at a non-work location.

47. Belko asked if Dunklin was aware of any progress in returning Belko to work, but Dunklin promptly cut off her question, saying that "it is up to MetLife to release you back to work."

48. Belko continued her efforts to return to work in January 2017.

49. On January 31, 2017, Belko provided a letter to the University from Dr. Anto Bagic, the Epilepsy Division Chief of UPMC's Neurology Department, with his medical opinion that "there is no obstacle from epilepsy point of view for [Belko's] full return to work starting February 1, 2017."

50. Within an hour of receiving Dr. Bagic's note, Jane Volk, Director of Employee and Labor Relations, emailed Belko.

51. In her email, Volk stated that the University had "serious questions" about Belko's ability to return. Despite no medical expertise, Volk expressed doubt as to the

professional opinion of Dr. Bagic, speculating that he "overlooked" several issues that "impact [Belko's] health and safety in returning to work."

52. Volk then stated that additional releases were needed "from Dr. Kreinbrook in addition to the requested additional detail from Dr. Bagic and whatever doctor is your "[electroconvulsive therapy] Doctor" as you referred to in your December email to Peggie Dunklin."

53. In her email, Volk did not disclose that she had already written a letter directed to Dr. Kreinbrook—six weeks earlier—questioning his professional opinion that Belko could return to work.

54. Belko responded immediately, clarifying that Dr. Bagic was aware of her other treatments, and that she was no longer under the care of her ECT Doctor, but offering to obtain any further clearances that the University was not demanding.

55. On February 10, 2017, Volk sent another letter to Belko, stating that if the University has "not received a satisfactory release from all of your treating physicians by February 28, 2017, we will terminate your employment and move ahead with replacing you in your position." Belko immediately took action to meet the University's new demands.

56. On February 14, 2017, the University published a job posting for Belko's position.

57. However, on February 22, 2017, MetLife "approved" Belko's claim for long-term disability benefits.

58. Belko never filed a "claim" for long-term disability benefits. Rather, MetLife automatically converted her short-term disability claim to a long-term disability claim, after tshe completed a six-month "Elimination Period."

59. On February 23, 2017, the University sent Belko a termination letter, noting that

> We have been informed that you have been approved for long-term disability. As we stated in previous communications, because of the undue hardship of not having someone working in your [position], we have concluded that there is no alternative other than terminating your employment and replacing your position."

60. In short, the University actively prevented Belko from returning to work, throwing up every roadblock it could, and demanding evermore clearances from her various medical professionals. Despite giving Belko a deadline to provide those clearances, the University quickly terminated her before it had expired, using a third-party insurance provider's determination—which the University aggressively encouraged—as a cover for its own discriminatory decision.

61. As a result of the University's discrimination, Belko has suffered, and will continue to suffer, a substantial loss of earnings, including, but not limited to, back and front pay, benefits, and other emoluments of employment.

62. As a direct and proximate cause of the University's discrimination, Belko has also experienced significant distress and emotional trauma.

63. Defendant acted willfully and in reckless disregard of Belko's rights under the ADA and the PHRA by discharging her due to her disability.

64. Belko has exhausted her administrative remedies before the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission.

## COUNT I — VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
**(Disability Discrimination)**

65. The foregoing paragraphs are incorporated by reference.

66. At all relevant times, the University was Belko's "employer" under the ADA.

67. Belko is an individual with a disability under the ADA due to medical conditions that substantially limit one or more major life activities.

68. The University regarded Belko as disabled, and she had a record of having a disability.

69. Belko could perform the essential functions of her job with or without reasonable accommodation.

70. The University discriminated against Belko by firing her, in whole or in part, due to her disability.

71. As a result of the above described actions, the University violated the ADA, causing Plaintiff to suffer damages.

### COUNT IV — VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT
**(Disability Discrimination)**

72. The foregoing paragraphs are incorporated by reference.

73. At all relevant times, the University was Belko's "employer" under the PHRA.

74. The University discriminated against Belko by firing her, in whole or in part, due to her disability.

75. As a result of the above actions, the University violated the PHRA, causing Plaintiff to suffer damages.

### PRAYER FOR RELIEF

WHEREFORE, Belko respectfully requests that the Court assume jurisdiction of her claims, find in her favor on all counts, enter judgment on her behalf, and award her:

a) Back and front pay, lost benefits and emoluments of employment in order to make her whole as if the discharge had not occurred;

b) General, consequential, and compensatory damages;

    c)      Liquidated damages;

    d)      Punitive damages;

    e)      Medical and related expenses;

    f)      Interest and costs of this action;

    g)      Reasonable attorneys' fees; and

    h)      Any other relief that the Court considers proper.

                                          Respectfully submitted,

Dated: October 4, 2019                       /s/Vincent J. Mersich
                                                    Vincent J. Mersich, Esquire
                                                    PA ID No. 310971
                                                    vmersich@stembercohn.com
                                                    **STEMBER COHN &**
                                                                **DAVIDSON-WELLING, LLC**
                                                    The Hartley Rose Building
                                                    425 First Avenue, 7th Floor
                                                    Pittsburgh, PA  15219
                                                    T.:  (412) 338-1445
                                                    F.:  (412) 338-1446

                                                    *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTELLE BELKO,<br><br>             Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF PITTSBURGH,<br><br>             Defendant. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

**DEMAND FOR TRIAL JURY**

Plaintiff hereby demands a jury trial on all issues so triable in the above-captioned action.

                              Respectfully submitted,

Dated: October 4, 2019            /s/Vincent J. Mersich
                              Vincent J. Mersich, Esquire
                              PA ID No. 310971
                              vmersich@stembercohn.com
                              **STEMBER COHN &**
                              **       DAVIDSON-WELLING, LLC**
                              The Hartley Rose Building
                              425 First Avenue, 7th Floor
                              Pittsburgh, PA 15219
                              T.:  (412) 338-1445
                              F.:  (412) 338-1446

                              *Attorneys for Plaintiff*